*United States Bankruptcy Court*
*For the District of Massachusetts*
*Western Division*

|  |  |
|---|---|
| In re ) | |
| ) | |
| **Peter Murphy Ribaudo**, ) | Case No. **10-43081** |
| ) | Chapter **13** |
| Debtor. ) | |
| ) | |

## MOTION FOR RECONSIDERATION OF ORDER GRANTING

## STAY RELIEF TO ONEWEST BANK, FSB

To the Honorable Henry J. Boroff, U.S. Bankruptcy Judge:

OneWest Bank FSB received relief from the automatic stay by this Court's Order of October 26, 2010. The debtor requests reconsideration, respectfully reminding the Court that counsel's averments of corporate irregularities by OneWest's mortgage assignor was received by the Court with its greatest interest. In support thereof, the debtor states:

1. On June 17, 2010, the debtor filed for relief under Chapter 13. The Meeting of Creditors was held on August 30, 2010.

2. One July 15, 2010 the debtor filed his proposed plan. Objections by the trustee, OneWest, and Deutsche Bank were sustained, and a further plan is due by October 29th. (The debtor notes that certain plan provisions in other cases are under

advisement which are pertinent to this case, and decisions are expected momentarily.)

3. OneWest Bank, FSB moved for stay relief on September 21, 2010. It was granted over objection on October 26, 2010, with the Court noting the severity of debtor's assertions of corporate irregularities by OneWest's mortgage assignor and inviting the debtor to seek reconsideration "with more meat" supporting the assertions.

4. OneWest's Motion attached as as an exhibit the original May 10, 2006 mortgage by the debtor to MERS, Mortgage Electronic Registration Systems, Inc. "acting solely as a nominee for Lender" which was identified as People's Mortgage Corporation.

5. OneWest's Motion also attached as an exhibit the January 11, 2010 Assignment of Mortgage by Mortgage Electronic Registration Systems, Inc. which purported to assign to OneWest Bank, FSB "all the right, title, and interest that Assignor has as current holder of the following Mortgage". This Assignment of Mortgage was signed by "Suchan Murray" who claimed to be an Authorized Signatory.

**Restated First Affirmative Defense**

6. In Massachusetts, mortgage assignments may only be executed by "a person purporting to hold the position of president, vice president, treasurer, clerk, secretary, cashier, loan representative, principal, investment, mortgage or other

offider, agent, asset manager, or other similar office or position, including assistant to any such office or position". G.L.M. c. 183 section 54B:

7. The debtor asserts that "Authorized Signatory" does not meet this burden of officership.

8. The debtor asserts that a mortgage is an interest in real estate in Massachusetts, and that strict compliance with a Massachusetts transfer requirement is required for the transfer to be effective.

**Restated Second Affirmative Defense**

9. The debtor anticipates OneWest will argue that Suchan Murray was properly appointed by MERS to sign the mortgage assignment. The debtor asserts otherwise, because the chain of authority from MERS to its corporate secretary William Hultman, and then to Suchan Murray, is broken.

10. Attached to this Motion is a copy of the April 7, 2010 deposition transcript of William Hultman. (The debtor has ordered a certified copy of the transcript and its exhibits but does not yet possess them.)

11. To assist the Court and OneWest, the debtor summarizes what he believes to be the pertinent parts of the deposition in the following paragraphs to show that Hultman appointed corporate officers for MERS without proper authority.

12. Hultman testifies to the three MERS entities in his deposition. PP 29-30.

   a. Mortgage Electronic Registration Systems, Inc. was created in October of 1995. P. 41. It went out of existence on June 30, 1998. P. 42.

   b. A new Mortgage Electronic Registration Systems, MERS 2, was created on June 30, 1998, which took over the first one's responsibilities. PP. 43 and 47. MERS 2's name was changed in 1999 to Merscorp, Inc. P. 32. (MERS 2 became Merscorp.) It succeeded totally to the business interests of MERS 1. P. 46.

   c. On January 1, 1999, a wholly owned subsidiary of Merscorp was created and was called also Mortgage Electronic Registration Systems, Inc. (MERS 3.) It does nothing but hold mortgages pursuant to the rating companies' bankruptcy-remote special purpose vehicle instructions to achieve investment grade ratings for the mortgage pools.

   "Basically, the subsidiary assumed all of the authority relating to holding title to the mortgage (sic should be mortgages) that the original corporation had." P. 30. "The subsidiary is a single purpose corporation that was incorporated for the sole purpose of holding title to the mortgage. The other operations of the old corporation [Merscorp, Inc., formerly Mortgage Electronic Registration Systems,

>   Inc.] remained with the parent corporation, the operation of the registry and the other operational issues associated with the MERS process. … [t]he primary duty of the subsidiary is to act as mortgagee when requested by the borrower and our members." P. 31. "The subsidiary['s] … sole purpose became holding title to mortgages." PP. 31-32. It has no other responsibilities. The 1999 change, whereby MERS became Merscorp and a new MERS was formed which was (1) wholly owned by Merscorp and (2) which did nothing other than hold mortgages, was made to achieve bankruptcy remote single purpose status for the entity holding the mortgages. This was a requirement of the rating agencies to achieve an investment grade rating for the mortgage pools. P. 32. "Bankruptcy remote" means that there is an independent director who would have to vote before the entity could file for bankruptcy protections. P. 33.

13. The parent company Merscorp, formerly MERS 2, is the only MERS that has employees. It does not hold mortgages. Mortgage titles are held only by MERS 3. This includes the responsibility of releasing mortgage liens. P. 48.

14. The debtor asserts that only MERS 3 can assign mortgages, since it is the only MERS entity which can hold and release mortgages.

15. Merscorp is Hultman's employer. P. 13.

16. Hultman is the secretary and treasurer of Mortgage Electronic Registration Systems, Inc. (MERS 3.) P. 13.

17. MERS 3 has no employees, paid or otherwise, and has not had any in the past five years. P. 70.

18. Hultman is the senior vice president, corporate division manager, secretary, and treasurer of Merscorp, Inc.

19. Hultman uses "MERS" to mean Mortgage Electronic Registration Systems, Inc. (MERS 3.)  P. 18.

20. Sometime before 2000, MERS' policy that only MERS members could be MERS officers was changed to allow non-MERS members to be MERS officers. PP 22-23.

21. The policy was changed by MERS' president, R.K. Arnold, vice president, Daniel McLaughlin, vice president Carson Mullen, and Hultman as MERS' secretary and treasurer.

22. When asked if Hultman had knowledge of any resolution by the MERS board of directors authorizing a change in MERS policy to allow non-MERS members to become MERS officers, he responded by stating that "[t]here was a resolution that authorized me [Hultman] to appoint officers of MERS that was passed by the board of directors of that company." P. 24.  It was passed in April of 1998,  P. 25, later clarified as April 9, 1998.  P. 41.

23. That resolution which authorized Hultman to appoint officers of MERS was passed by Merscorp in April of 1998, P. 25, when Merscorp was still known as MERS.  (The name change from MERS to Merscorp did not occur until 1999.)

24. The new MERS, created in 1999 (MERS 3), was in no way bound by any prior activity of the old MERS (MERS 2, now known as Merscorp). P. 34.

25. Based on these words, the debtor asserts that the resolution which authorized Hultman to appoint officers was a resolution of the pre-1999 MERS 2, which became Merscorp, did not bind the new 1999 MERS 3 in any way. MERS 3 is the only entity holding mortgages. Hultman has no authority to appoint officers for the new 1999 MERS (MERS 3), which holds all the MERS mortgages, as his authority is only based on a resolution of the old pre-1999 MERS (MERS 2), which is now known as Merscorp and which does not hold any mortgages.

**Restated Third Affirmative Defense**

26. Hultman has no authority under any MERS bylaws to appoint officers. The MERS bylaws only authorize its directors to appoint officers. The directors' resolution, granting Hultman the authority to appoint officers, is *ultra vires* and beyond the power given by the bylaws to the directors.

27. Hultman testifed that "there was a resolution that authorized me to appoint officers of MERS that was passed by the board of directors of that company." P. 24. We have seen that this resolution was passed on April 9, 1998 by MERS 2, now called Merscorp. ¶¶ 19 and 20.

28. Hultman appoints MERS officers by way of his own resolutions, which he believes to be authorized by a resolution of the MERS board of directors. P. 58. (Consistent with the debtor's Restated Second Affirmative Defense, the debtor asserts that "MERS" in this context was Merscorp, formerly called MERS and called MERS 2 for the purposes of this Motion. It was not the MERS 3 which actually holds the mortgages.) The MERS board never meets to pass resolutions appointing assistant secretaries and and vice-presidents (the officers commonly signing mortgage assignments). Hultman signs those resolutions. PP> 60-61.

29. Hultman has appointed thousands of unpaid MERS 3 assistant secretaries, in every state all around the country, pursuant to the April 9, 1998 resolution of the MERS 2 board of directors. There is no MERS 3 employee to whom these assistant secretaries report. PP. 71-72.

30. The MERS 1 bylaws, which went out of business on June 30, 1998, governed the conduct of the MERS board of directors during April of 1998. P. 92. (Exhibit 17.)

31. We have seen that April of 1998 is when the board of directors' resolution authorizing Hultman to appoint officers was passed.

32. Article 6 of those bylaws provide that the officers of the corporation, MERS 1, shall be chosen by the Board of Directors. There is nothing in the bylaws that authorizes

Hultman to appoint vice presidents or other officers or an "Authorized Signatory" such as Suchan Murray in this case. PP. 93-95.

33. The same provisions appear in the MERS 3 bylaws effective January 1, 1999. P. 99. (Exhibit 18.) (The bylaws of MERS 2, Merscorp, were not produced for the deposition. P. 100.)

34. The MERS 3 bylaws only authorized its board of directors to appoint officers. The resolution of the MERS 3 directors which authorized Hultman to appoint officers was *ultra vires.* Hultman appointed thousands of officers throughout the country who were not MERS 3 employees.

35. Hultman appointed all of the vice presidents and secretaries. No one else has used Hultman's authority to appoint certifying officers under the MERS 2 resolution of April, 1998. P. 132. (Certifying officers is another label, in addition to vice-presidents and assistant secretaries, for persons supposedly authorized to sign documents on behalf of a MERS entity. PP 50-51, P. 95, P. 105.)

36. The MERS 3 bylaws in effect in January of 1999 have not been amended. The MERS 2 bylaws that were in effect since April of 1998 have not been amended. P. 132.

37.   Pending further discovery, there is every reason to believe that Suchan Murray was an "Authorized Signatory" - a position not recognized by Massachusetts law for the signing of mortgage assignments - unlawfully appointed by Hultman to act on behalf of MERS 3.

**Restated Fourth Affirmative Defense**

38.   The United States Bankruptcy Court for the Northern District of Indiana, has ruled that a signing officer must be an employee.  Since MERS has no employees, its assignments are "bogus" and "fraudulent", as that court stated.  "It appears to this court that a fraudulent recorded Assignment of Mortgage might still be found today in the St. Joseph County Recorder's Office, despite MERS' knowledge of the false signature.  Indeed, MERS has completely sidestepped the fact that this Assignment was signed by someone representing herself to be a Vice President of MERS [after having admitted that she is not a MERS employee], and it had declined to explain why this false document was attached to the amended Proof of Claim."  *Koontz v. Everhome Mtge. Co, et al (In re Koontz)*, Bankr. N.D. Ind. Proceeding No. 10-3005 (September 30, 2010 Memorandum of Decision on Motion for Summary Judgment) (unable to attach as an Exhibit as file is too large).

**Restated Fifth Affirmative Defense**

39. The "Authorized Signatory" for the January 11, 2010 Assignment of Mortgage from MERS to OneWest was Suchan Murray, as appears on the Exhibit to OneWest's Motion.  Yet, not five months earlier, the same Suchan Murray signed an Assignment as OneWest's attorney-in-fact. Exhibit C.  It is more likely than not that Murray was wearing the two hats at the same time, signing the assignment to OneWest on behalf of MERS while also acting as OneWest's attorney in fact for other transactions.  Since an officer owes her principal her undivided loyalty - dare we call it her employer, knowing that MERS has no employees? -, Murray appears to have acted contrary to this basic rule of duty. Murray's signature on MERS' behalf, while also acting on OneWest's behalf in another transaction, must have exceeded her authority as MERS' "authorized signatory" and the Assignment of Mortgage is void.

**Restated Sixth Affirmative Defense**

40. The May 10, 2006 Promissory Note to the original lender People's Mortgage Corporation was first endorsed to IndyMac Bank, F.S.B. on May 22, 2006 and then endorsed in blank by IndyMac's assistant vice president on an unstated date. OneWest does not state when it received possession of the Note.  Indeed, it does not affirmatively state that it even has the Note. The best that its counsel could state at the hearing was that OneWest had possession of the Note "upon information and belief".

41. Possession "upon information and belief" cannot be sufficient to take another's home. Consider someone saying that they have a $100.00 Federal Reserve Note upon information and belief. Surely the Court would not provide $100.00 of consideration for that statement. Either OneWest has the Note or it doesn't. It must not enjoy relief from stay until it can make an unqualified representation of possession.

42. Perhaps the real reason that OneWest cannot make an affirmative statement of possession is that only an image of the Note was not given to it. IndyMac was closed by the Office of Thrift Supervision on July 11, 2008. If ithe original Note is missing, then OneWest must come forward with an affidavit of such by a person with first-hand knowledge of the circumstances of its loss.

43. *Grella* only requires a colorable claim, to be sure, but an **undated** endorsement in blank from a closed bank cannot establish the color of a claim.

                The debtor, by counsel

                /s/ L. Jed Berliner, Esquire
                L. Jed Berliner, Esquire, BBO #039950
                Berliner Law Firm
                95 State Street, Suite 1010
                Springfield, MA  01103-2081
                telephone:  (413) 788-9877
                facsimile:  (413) 746-9877
                email:  jed@berlinerlaw.com

**Certificate of Service**

The undersigned certifies that this document was filed with the Court in a manner appropriate for automated service of true electronic images to all ECF Registrants in this Case or Proceeding, including the Case Trustee and the U.S. Trustee and respondent OneWest's counsel, at their registered electronic addresses.

Date:   November 6, 2010                /s/ Jed Berliner
                                        L. Jed Berliner